**THE LIMITED, INC., Plaintiff**

v.

**CIGNA INSURANCE COMPANY,**
**Defendant**

No. 00–CV–3766.

United States District Court,
E.D. Pennsylvania.

Feb. 23, 2001.

Order Denying Reconsideration
April 5, 2002.

Arnold L. Natali, Jr., David A. Thomas, Patrick J. Perrone, McCarter & English, Newark, NJ, Glenn P. Callahan, McCarter & English, LLP, Philadelphia, PA, for Plaintiff.

Steven D. Johnson, Paul D. Rowe, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for Defendant.

### *ORDER*

NEWCOMER, Senior District Judge.

AND NOW, this 22nd day of February, 2001, upon consideration of the following motions, and responses thereto, it is hereby ORDERED as follows:

(1) Plaintiff's Motion for Summary Judgment (Paper # 8) is DENIED.

(2) Defendant's Motion for Summary Judgment (Paper # 7) is GRANTED.

(3) JUDGMENT is ENTERED in favor of defendant.

(4) This action is DISMISSED on all counts.

## I. BACKGROUND

Plaintiff The Limited, Inc. brings the instant action for declaratory judgment against Defendant CIGNA Insurance Company, now known as ACE American Company ("ACE"), for insurance coverage under an insurance policy plaintiff purchased from defendant in 1999.

### A. THE INSURANCE POLICY

On or about February 1, 1999, The Limited purchased from ACE a **"Product Tampering & Accidental Contamination** Insurance Policy" ("Policy"). The Policy period covered February 1, 1999 through February 1, 2002, whereby ACE agreed to pay The Limited for losses covered by the Policy "caused by or resulting from a Product Tampering or Accidental Contamination of a **Covered Product(s).**" The Policy has an aggregate limit of $10 million for each loss per year with a $100,000 deductible.

The Policy contains the following definitions for "Accidental Contamination" and "Covered Product":

**Accidental Contamination** means any accidental or unintentional contamination, adulteration or pollution of a **Covered Product(s)** which occurs while you are manufacturing, producing, processing, preparing, packaging, or labeling the **Covering Product(s)** if such contamination, adulteration or pollution:

1. has resulted or would result in bodily injury, sickness, disease or death to any person or animal if consumed or used; or

2. has caused or would cause physical damage to or destruction of tangible property; or

publicity specifically naming you or your **Covered Product(s)** as the subject of an **Accidental Contamination** covered herein.

**Covered Product(s)** means those products (or any of their ingredients or components) manufactured, distributed, handled or sold by you or for you by others and listed in the Declaration.

**Covered Product(s)** also means any new product line(s) introduced or acquired after the inception of this policy, provided written notice is given to us within ninety (90) days of such introduction or acquisition.

### B. THE FOAM BURST PRODUCT AND THE UNDERLYING CLAIMS

The Limited, through its subsidiary Bath & Body Works ("BBW"), sells cosmetic and personal care products, among other things, in retail stores nationwide. One of the personal care products in the BBW personal care product line is Foam

Burst Moisturizing Body Wash ("Foam Burst"), a fragrant shower gel that produces a cleansing lather when it is dispensed from its container and exposed to water. Foam Burst is aerosol-dispensed from 6.8 oz metal canisters which are sold individually and in gift-baskets. Foam Burst is packaged under pressure, and its contents are dispensed by triggering the "actuator" on the canister.

In June 1999, BBW entered into a Licensing Agreement with Cussons (International) Limited, whereby Cussons granted a license to BBW to "make, have made, use, consign, and to advertise, promote, market, sell and otherwise distribute" Foam Burst for a two-year period. Under the Licensing Agreement, until BBW selected a local manufacturer that was capable of manufacturing Foam Burst that was commercially saleable, Cussons "agreed that it [would] manufacture [Foam Burst] on behalf of [BBW], subject to agreement." The manufacture of Foam Burst never proceeded to local product; instead, Cussons manufactured the Foam Burst on BBW's behalf. Cussons was solely responsible for the creation, design, and manufacture of the Foam Burst and all of its component parts, including its container.

By September 1999, BBW began importing Foam Burst and selling it in its retail stores nationwide. Starting in October 1999, BBW began receiving complaints from consumers that they had suffered eye injuries allegedly resulting from their use of Foam Burst. On May 4, 2000, BBW issued a press release, that was posted on the FDA website, announcing that it had "voluntarily recalled" Foam Burst from its stores. The press release stated in part:

> If the Foam Burst product is not used in accordance with the directions for use printed on the label, the gel, when dispensed, can inadvertently be sprayed into the eyes, resulting in potential temporary eye irritation.... In response to the company's concerns for its customers, Bath & Body Works has developed a new dispenser for the Foam Burst product, which it will introduce shortly.

The Cincinnati District Office of the FDA subsequently wrote to BBW in a letter dated May 23, 2000, which stated:

> [The FDA agrees] with your firm's decision to recall all product codes and fragrances of your aerosol-dispensed Foam Burst Moisturizing Body Wash, packed in 6.8 oz (192g) metal containers.... We have reviewed your action and conclude that it meets the formal definition of a 'recall.' This is significant, as your action is an alternative to a Food and Drug Administration (FDA) legal action to remove your defective product from the market.... This recall has been classified by the FDA as a class II action. This means a situation in which use of, or exposure to, the violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote.

The Limited proceeded to recall Foam Burst from the retail stores and attempted to return the product to the market in a different canister. In the process, The Limited incurred substantial costs in connection with the recall, the reintroduction of Foam Burst, and lost sales. When The Limited sought to recover from defendant its costs and losses from the recall under the Policy, ACE refused to pay, denying insurance coverage.

Plaintiff then filed the instant action for declaratory judgment, breach of contract, and bad faith. Plaintiff and defendant have now filed Cross–Motions for Summary Judgment. Defendant argues that the Court should determine as a matter of law that plaintiff's claim does not fall under the coverage afforded by the Policy,

while plaintiff contends that its recall of Foam Burst does fall within the coverage afforded by the Policy. Essentially, the parties agree that there are no genuine issues of material fact with regards to the issue of coverage of plaintiff's claim for insurance, while they contest the definition of certain terms and provisions in the Policy that would determine whether plaintiff's claim should or should not be covered by the Policy.

## II. SUMMARY JUDGMENT STANDARD

■ The standards by which a court decides a summary judgment motion do not change when the parties file cross motions. *Southeastern Pa. Transportation Auth. v. Pennsylvania Pub. Util. Commission*, 826 F.Supp. 1506 (E.D.Pa. 1993). A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988). The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding the motion for summary judgment, it is not the function of the Court to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248–49, 106 S.Ct. 2505.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts, by use of affidavits, depositions, admissions, or answers to interrogatories, showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Moreover, when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White,* 862 F.2d at 59 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## III. DISCUSSION

### A. COVERAGE OF PLAINTIFF'S CLAIM UNDER THE POLICY

■ Plaintiff contends that the Policy clearly and unambiguously provides coverage for its losses because its Foam Burst product was adulterated, and that the adulteration was unintentional. Defendant asserts that plaintiff cannot prove that it sustained a covered loss resulting from "accidental contamination" of a covered product, as defined in the Policy. In Pennsylvania, the burden of establishing a valid policy claim falls upon the insured. *See Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 23 (3d Cir.1985). Thus, as defendant adeptly notes in its Response to plaintiff's Motion for Partial Summary Judgment, in

order for plaintiff to meet its "burden of proving coverage under the policy for an 'accidental contamination,' ... plaintiff must establish:

(1) an accidental or unintentional adulteration;

(2) of a covered product;

(3) that occurred while the Foam Burst was being manufactured, produced, processed, prepared, packaged, or labeled;

(4) by plaintiff or anyone acting on plaintiff's behalf with whom plaintiff had a written agreement."

### 1. ACCIDENTAL OR UNINTENTIONAL CONTAMINATION

With respect to plaintiff's first burden under the Policy to establish an accidental contamination, plaintiff argues that the Foam Burst product was accidentally contaminated by an unintentional adulteration. The parties, however, differ on how the term "adulteration" in the Policy should be interpreted.

■■■ The task of interpreting an insurance contract is to be performed by the Court.[1] *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). The goal of that task is to ascertain the intent of the parties as manifested by the language of the written instrument. *Id.* Where the language is clear and unambiguous, the court is required to give effect to that language. *Id.* Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer. *Id.* The Third Circuit, applying Pennsylvania law, has held that an insurance policy provision is ambiguous if it "is reasonably susceptible to more than one interpretation." *The Medical Protective*

*Company v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999). Ambiguity only exists where a policy provision is reasonably susceptible of more than one meaning, not where the parties differ on meaning. *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 629 (Pa.Super.Ct.1998).

The parties' contentions with respect to the term "adulteration" requires the Court to examine the definitions of the term further. Plaintiff argues that because "adulteration" is not specifically defined in the Policy, its meaning should be examined in light of the business purposes sought to be achieved by the parties and given its common sense meaning in the context of this case. Plaintiff further asserts that the definition of "adulteration" set forth in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et. seq.*, ("Act") applies to the Foam Burst product and plaintiff's claim in this case. Defendant argues that the absence of a definition for "adulterated" in the Policy does not render the term ambiguous; instead, the undefined word should be given its plain and ordinary meaning. Defendant posits that the term "adulteration" requires the corruption of a substance by another substance.

*Black's Law Dictionary* defines the verb to "adulterate" as: "[t]o debase or make impure by adding a foreign or inferior substance." *BLACK'S LAW DICTIONARY* 52 (7th ed.1999). Similarly, *Webster's New World Dictionary* defines "adulterate" as: "to make inferior, impure, not genuine, etc. by adding a poor or improper substance." *WEBSTER'S NEW WORLD DICTIONARY* 20 (College Edition 1969). Under the Act, a cosmetic, such as Foam Burst, is deemed to be

---

1. Although defendant originally raised the issue of applying the substantive law of Ohio because the Policy was delivered there, defendant has subsequently agreed with plaintiff's contention that there is no conflict between the substantive laws of Ohio and Pennsylvania with respect to the interpretation of insurance policies. Therefore, the Court will simply apply the substantive law of Pennsylvania.

adulterated "if it bears or contains any poisonous or deleterious substance which may render it injurious to users . . . . [or if] its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health." 21 U.S.C. § 361(d).

In the instant case, the Court finds that the term "adulteration" in the Policy's definition of "accidental contamination" is susceptible of more than one meaning. It is not clear from the Policy whether "adulteration" should be defined by a dictionary or the Act. In either case, however, the Court also concludes that whether it uses a dictionary definition of "adulterate" or the definition of "adulteration" set forth by the Act, plaintiff has failed to demonstrate that the Foam Burst product was adulterated or accidentally contaminated under the provisions of the Policy.

It is clear to the Court that the Foam Burst product was not adulterated under the dictionary definition of the word. There was no substance—poor, foreign, improper, or inferior—added to the Foam Burst gel. There is also no evidence to suggest the product was debased, made impure, made inferior, or made not genuine by another substance. Rather, the evidence shows that the Foam Burst canister or container was defective.

Under the statutory definition of the Act, the Foam Burst product could be deemed adulterated if its container was *composed* of any poisonous or deleterious substance. However, the Court determines that there is no evidence to suggest that the Foam Burst canister was composed of any such substance. In fact, defendant's evidence shows, and plaintiff's

evidence does not refute, that the recall was based on the defective and malfunctioning dispenser, actuator, or cap of the product. Therefore, even with consideration of the Act's definition of "adulteration," the Foam Burst product does not qualify as having been adulterated.[2]

 The Court is further convinced that the term "adulteration" in the Policy was not meant to apply to the instant situation because of the context in the Policy provision. As defendant points out, the Policy is entitled a "Product Tampering & Accidental Contamination Insurance Policy" and the term "adulteration" is used in defining "accidental contamination" together with the terms "contamination" and "pollution." The plain language of the Policy and its title indicate that the parties intended to have coverage for only those specific instances of product tampering and accidental contamination, not for product recalls in general or for defective canisters.

Here, there was no product tampering, and no evidence that the Foam Burst product was "accidentally contaminated" or "adulterated" as those terms are defined in the Policy. Therefore, the Court agrees with defendant and determines that plaintiff's claim is not covered under the Policy. Accordingly, defendant's Motion for Summary Judgment is granted, plaintiff's Motion for Summary Judgment is denied, judgment is entered in favor of defendant, and this action is dismissed on all counts.

AND IT IS SO ORDERED.

---

**2.** While plaintiff contends that the recall was based on a finding by the FDA that the product was adulterated, the only evidence to support that contention is the self-serving Affidavit of Philip S. Renaud, II, the Vice President of Insurance for The Limited. The lone Affidavit is insufficient evidence at this stage of summary judgment to convince the Court that there is a genuine issue of material fact that the FDA did in fact make a determination that the product was adulterated.

## ORDER

AND NOW, this 5th day of April, 2001, it is hereby ORDERED as follows:

(1) Plaintiff's Motion to Amend the Complaint is DENIED as moot, the Court having already approved the parties' stipulation that plaintiff may amend its complaint and that judgment entered in favor of ACE pursuant to this Court's Order of February 22, 2001 also be amended to include Bath and Body Works, Inc.

(2) Plaintiff's Motion for Reconsideration of the Court's February 22, 2001 Order and Opinion is DENIED.

(3) All other outstanding motions are DENIED as moot, this action having been DISMISSED.

## I. BACKGROUND

Presently before the Court is Plaintiff The Limited, Inc.'s Motion for Reconsideration of the Court's February 22, 2001 Order and Opinion. In its February 22, 2001 Order ("February Order"), this Court denied plaintiff's Motion for Summary Judgment, granted defendant's Motion for Summary Judgment, entered judgment in favor of defendant, and dismissed the action on all counts. In the Opinion that accompanied the February Order, the Court dealt with the interpretation of a "Product Tampering & Accidental Contamination Insurance Policy" that The Limited had purchased from Defendant CIGNA Insurance Company, now known as ACE American Company ("ACE").[1] Notably, this Court found that "the term 'adulteration' in the Policy's definition of 'accidental contamination' is susceptible of more than one meaning" and that it was not clear from the Policy "whether 'adul-

teration' should be defined by a dictionary or the [Federal Food, Drug, and Cosmetic] Act."

This Court further concluded that in either case, whether using a dictionary definition of "adulterate" or the definition of "adulteration" as set forth in the Act, plaintiff "failed to demonstrate the Foam Burst product at issue was adulterated or accidentally contaminated under the provision of the Policy." Now, plaintiff moves for reconsideration of the February Order on the following grounds: (1) new evidence that the Foam Burst product was "adulterated" under the Act became available after the briefing on the motions for summary judgment was completed;[2] and (2) the Court apparently overlooked several key points of both fact and law in reaching its decision.

Specifically, as to the new evidence, plaintiff contends that the Court "had instructed that it would accept no new papers or submissions from the parties on the pending motions after the close of briefing on January 24, 2001. As a result, The Limited was unable to submit either the FDA Letter ... or the Schwemer Report ... to the Court." With respect to the overlooking of facts and law, plaintiff argues the following: (1) the Court did not apply the proper legal rule for construing an ambiguous term in an insurance policy, whereby "[u]nder both Ohio and Pennsylvania law, ambiguous terms must be read to find coverage for the insured;" and (2) in dismissing plaintiff's claim for bad faith, the Court overlooked the applicable law governing claims for bad faith claims handling because such claims are separate and

---

1. For the purposes of this Order, the Court incorporates the "BACKGROUND" section of the February Order.

2. This new evidence consists of a report rendered on January 29, 2001 by The Limited's

expert on FDA regulatory practices, William L. Schwemer, and a February 8, 2001 letter sent by the FDA to Bath & Body Works, allegedly setting forth the FDA's rationale for the Foam Burst recall.

independent from the underlying claims for coverage or breach of the Policy.

## II. LEGAL STANDARD: MOTION FOR RECONSIDERATION

■ The purpose of a motion for reconsideration, as is often stated, is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985). A motion for reconsideration may be granted where: (1) there has been a change in controlling law between the court's decision and the filing of the motion; (2) evidence not previously available comes to light; or (3) there is need to correct a clear error of law or prevent a manifest injustice. *Cohen v. Austin*, 869 F.Supp. 320, 321 (E.D.Pa.1994).

■ In the Third Circuit, a motion for reconsideration, even where purportedly grounded on the court's commission of clear error, is not to be used merely as an opportunity to reargue issues that the court has already analyzed and determined. *Waye v. First Citizen's National Bank*, 846 F.Supp. 310, 314 (M.D.Pa.1994). "[A] motion for reconsideration addresses only factual and legal matters that the Court may have overlooked .... It is improper on a motion for reconsideration to 'ask the Court to rethink what [it] had already thought through—rightly or wrongly.'" *Glendon Energy Co. v. Borough of Glendon*, 836 F.Supp. 1109, 1122 (E.D.Pa.1993) (citation omitted).

3. Moreover, in light of the fact that the parties filed cross motions for summary judgment, the Court inquired as to whether the parties were in agreement that the motions were dispositive of the instant action. As referenced in defendant's letter of February 6, 2001 to this Court, the parties did in fact represent to the Court that their respective

## III. DISCUSSION

### A. NEW EVIDENCE

#### 1. PLAINTIFF'S NEW EVIDENCE

■ First, the Court notes that plaintiff is incorrect in suggesting that the Court "instructed that it would accept no new papers or submissions from the parties on the pending motions after the close of briefing on January 24, 2001." Rather, as defendant points out in its Response to plaintiff's Motion for Reconsideration, it was agreed by both parties that no further briefs would be filed and that the motions would be decided on the papers that had already been submitted to the Court.[3] Second, while The Limited asserts that it was unable to submit its new evidence by the time the Court filed the February Order, plaintiff does not disclose how its own inabilities may have attributed to its failure to conduct proper discovery.

The Court's Scheduling Order of October 31, 2000 established January 8, 2001 as the date for discovery completion and the filing of dispositive motions, and January 22, 2001 as the date for filing responses to the dispositive motions.[4] More importantly, pursuant to representations made to the Court during a Pretrial Conference, the Scheduling Order indicated that the parties had agreed to exchange expert reports upon mutual agreement. In light of the Scheduling Order, the parties' agreements, and the parties' representations to the Court, it was plaintiff's burden to conduct all discovery it felt was necessary for the purposes of filing dispositive motions or any responses in a timely fashion. Con-

motions were dispositive (at least as to the issues of liability).

4. The Court subsequently issued an Order on January 23, 2001 permitting the parties to serve their opposition briefs by January 24, 2001.

sequently, plaintiff's failure to obtain its "new" evidence was plaintiff's own fault. The Court will not now excuse plaintiff for agreeing to exchange expert reports *after* the deadlines for discovery completion and for filing of dispositive motions and responses. Moreover, as the Court noted in its Order of February 12, 2001, plaintiff failed to seek any discovery relief until the deadline for discovery had expired. Therefore, the Court finds that plaintiff's "new" evidence does not constitute "evidence not previously available" as required by the second ground for reconsideration.[5]

## B. CLEAR ERRORS OF LAW

### 1. AMBIGUOUS TERMS

Plaintiff also argues that the Court erred because it incorrectly applied the law with respect to ambiguous policy terms. Plaintiff's assertions, however, are simply an attempt to reargue issues that the Court already analyzed and determined. As outlined in the February Order, the task of interpreting an insurance contract is to be performed by the Court. *See Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer. *Id.* The Third Circuit, applying Pennsylvania law, has held that an insurance policy provision is ambiguous if it "is reasonably susceptible to more than one interpretation." *The Medical Protective Company v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999). Ambiguity only exists where a policy provision is reason-

ably susceptible of more than one meaning, not where the parties differ on meaning. *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 629 (Pa.Super.Ct.1998).

■ In the February Order, this Court found that the term "adulteration" in the Policy's definition of "accidental contamination" is susceptible of more than one meaning. Therefore, the Policy definition of "accidental contamination," and specifically the definition of "adulteration," should be construed in favor of the insured and against the insurer. In the instant case, however, plaintiff would have the Court make an outright finding for *coverage* based on the ambiguity of the Policy's definition of "adulteration." The Court refuses to do so. In an effort to *construe* the Policy provision in favor of the insured and against the insurer, the Court found that neither definition proposed to the Court by the parties was favorable to the insured; that is to say, neither definition of adulteration applied to the Foam Burst product. As defendant adeptly notes in its Response to plaintiff's Motion for Reconsideration, "although the Court found, as advocated by plaintiff, that the term was capable of more than one reasonable interpretation, it held that neither interpretation of the term resulted in a finding of coverage."

### 2. BAD FAITH CAUSE OF ACTION

■ Finally, plaintiff claims the Court committed a clear error of law when it ordered a blanket dismissal of all of The Limited's claims without any assessment

---

5. Even with consideration of plaintiff's "new" evidence, the Court's decision as to coverage would not change. While plaintiff argues that the FDA Letter and its expert report provide evidence that the Foam Burst product was adulterated, the Court disagrees. At best, plaintiff's evidence serves as a speculative opinion as to what the FDA *may* have determined as to the Foam Burst product. It does

not, however, provide evidence as to the terms of the Policy, or that the FDA determined that the product was adulterated. In fact, as plaintiff and its expert concede, the FDA did not issue formal charges of adulteration in this case. Therefore, the "new" evidence does not alter the Court's initial interpretation of the Policy's terms and its decision as to coverage.

of the merits of its cause of action for bad faith claims handling and investigation. Under Pennsylvania law, to establish a claim for bad faith, a claimant must prove by clear and convincing evidence that the insurer lacked a reasonable basis for denying coverage and knew or recklessly disregarded its lack of a reasonable basis. *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.Ct.1999) appeal denied, *Goodman v. Durham*, 563 Pa. 663, 759 A.2d 387 (2000). Bad faith on the part of an insurer is "any frivolous or unfounded refusal to pay proceeds of a policy." *Jung v. Nationwide Mut. Fire. Ins. Co.*, 949 F.Supp. 353, 356 (E.D.Pa.1997) (citations omitted); see *Adamski*, 738 A.2d at 1036 (stating same). It has also been determined that "[t]he absence of a duty to provide coverage during a lapse precludes a finding of bad faith." *Fasanya v. Allstate Indem. Co.*, 2001 WL 4995 (E.D.Pa. Dec.28, 2000).

Here, the Court has determined that the insurer did not "lack a reasonable basis for denying coverage." In fact, the Court has found that defendant did not have a duty to provide coverage under the provisions of the Policy. Therefore, the Court concludes that it did not commit any error of law in granting summary judgment in favor of defendant.

In light of the foregoing, plaintiff's Motion for Reconsideration is denied.

AND IT IS SO ORDERED.