Filed 2/6/15; pub. order 3/3/15 (see end of opn.)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

WINDSOR FOOD QUALITY
COMPANY, LTD.,

    Plaintiff and Appellant,

v.

THE UNDERWRITERS OF LLOYDS OF
LONDON et al.,

    Defendants and Respondents.

E058324

(Super.Ct.No. CIVRS905013)

OPINION

APPEAL from the Superior Court of San Bernardino County. Keith D. Davis, Judge. Affirmed.

Shernoff Bidart Echeverria Bentley, Michael J. Bidart, Ricardo Echeverria, Steven Messner; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Hamrick & Evans, A. Raymond Hamrick, III and Douglas K. Lackey for Defendants and Respondents.

1

I

INTRODUCTION

Plaintiff and appellant Windsor Food Quality Company, Ltd. (Windsor) manufactured Jose Ole frozen food products, using ground beef supplied by Westland/Hallmark Meat Company (Westland). In 2008, after a voluntary United States Department of Agriculture (USDA) recall of Westland beef, Windsor made a claim under its Contamination Products Insurance policy,[1] issued by defendants and respondents— QBE Insurance (Europe) Limited and Underwriters of Lloyds, London (Lloyds). After Lloyds denied coverage on various grounds, Windsor sued for breach of contract and bad faith. The trial court granted Lloyds's summary judgment motion, finding no triable issues of material fact and no coverage.

Windsor appeals, arguing that it is entitled to insurance coverage based on a reasonable interpretation of Lloyds's policy. Windsor also contends that whether Lloyds acted in bad faith remains a triable issue of fact, which only a jury can resolve.

Lloyds responds that Westland's ground beef was not an "Insured Product" under the policy and—even if the ground beef was an insured product—it was not "tampered with" or the tampering was not "malicious." Finally, Lloyds contends that, even if it wrongly denied coverage, it acted reasonably as a matter of law, and is not subject to bad-faith liability.

---

[1] The Lloyds policy is not a recall insurance policy. (*Hot Stuff Foods, LLC v. Houston Cas. Co.* (8th Cir. 2014) 771 F.3d 1071, 1076.)

As the dissent recognizes and articulates, this dispute ultimately concerns whether the Lloyds policy covers ingredients obtained from a supplier and used in Windsor's products. We conclude Windsor cannot claim coverage for the recall of Westland's ground beef. We agree with the trial court there are no disputed material facts and no bad faith by Lloyds. We affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND

*1. The Complaint*

Windsor sued Lloyds for denying its claim for the losses caused by the recall of its products containing Westland's ground beef. Windsor's operative complaint asserts three causes of action for the breach of an implied covenant of good faith and fair dealing, breach of contract, and declaratory judgment. Windsor maintains it is entitled to coverage under the insurance provision for "Malicious Product Tampering." The first amended complaint makes the following allegations.

Windsor is a wholesale producer of beef products and Westland is its supplier. Windsor purchased ground beef from a Westland slaughterhouse in Chino. Westland employees admitted participating in criminal animal abuse.

On January 30, 2008, the USDA suspended Westland as a supplier to federal food and nutrition programs because of an investigation of the prohibited use in human food of "non-ambulatory disabled cattle [downer cows] and cattle tissue identified as specified risk materials." On February 17, 2008, the USDA announced a voluntary Class II recall of all Westland products for a two-year period because Westland had used "downer

3

cattle" that may have been contaminated. One possible risk was infection by Bovine Spongiform Encephalopathy (BSE), known as "mad cow" disease, that can cause Creutzfeldt-Jakob Disease (CJD), a neurological disease in humans. As described by the USDA, a Class II recall involves "a health hazard situation where there is a remote probability of adverse health consequences from the use of the product." Windsor recalled its products, incorporating Westland Beef, and incurred about $3 million dollars in recall costs.

Lloyds issued a $4 million policy for contamination products insurance to Windsor, effective from May 6, 2007 to May 6, 2008, which includes coverage for "Accidental Product Contamination" and "Malicious Product Tampering." Section 1.2 defines an "Insured Event" as "(a) any actual Accidental Product Contamination; [¶] (b) any Malicious Product Tampering; [¶] (c) any Product Extortion Demand." Section 5.7 of the insurance policy defines "Insured Products" as "all products including their ingredients and components *once incorporated therein of the Insured* that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . . [Emphasis added.]" Section 5.10 provides that "Malicious Product Tampering" means "the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insured['s] Products whether in conjunction with a Product Extortion Demand or not so as to give the Insured or consumers reasonable cause to

4

consider the Insured Products unfit or dangerous for their intended use."[2]  On July 7, 2008, based on section 5.1, Lloyds denied Windsor's claim for "Accidental Product Contamination," which "would lead to or has led to bodily injury, sickness, or disease of any person, animal or livestock physically manifesting itself within 120 days of its consumption or use."  It is not disputed that there was no actual injury to consumers from Westland beef within 120 days.

*2. Summary Judgment Motion*

The parties identified two sets of material facts in their combined separate statements.  We summarize the facts, determining whether any material facts are effectively disputed by Windsor.

The parties concur as to Lloyds's description of the USDA's comprehensive testing and recall procedures and Lloyds's explanations of CJD and BSE, including the declaration of Dr. Richard T, Johnson, a neurologist and an expert on CJD.  Dr. Johnson explained the average incubation period for CJD in human is at least 10 years and "[t]here is no evidence that manifestation of such illness will occur within a period of 120 days of consumption of BSE contaminated beef products."  There were no reports or evidence of anyone becoming ill from ingesting Windsor's products.

The USDA Class II voluntary recall was based on "'a health hazard situation where there is a remote probability of adverse health consequences.'"  The USDA stated

---

[2]  Section 5.13, which is not at issue in this appeal, provides that "Product Extortion Demand" means "any threat or connected series of threats received by the Insured to commit Malicious Product Tampering for the purpose of soliciting money, securities or property."

5

the recall was about failure to comply with FSIS regulations and "was not about food safety" and "really not a health-related issue." In particular, the recall was caused by Westland's failure to initiate USDA inspections of downer cattle. Windsor attempted to dispute these assertions by describing them as Lloyds's attempt "'publicly [to] downplay the recall's significance.'" Without identifying any evidence, Windsor contends that, if there had not been a health risk, then the USDA would have declared a Class III recall, not a Class II recall. Windsor submitted additional facts about BSE and CJD, which Lloyds countered were irrelevant, inaccurate, or not disputed.

As fact No. 51, Lloyds asserted, "'[t]here was no intentional and malicious adulteration of the products of Windsor Foods[.']" As evidence, Lloyds cited the testimony of two witnesses—Windsor employees, Michael Cramer and Manuel Martinez—that they had no information about intentional or malicious contamination or extortion involving Windsor's products. Windsor responded that Lloyds was not presenting a fact but arguing a legal conclusion. Lloyds objected to the relevance and admissibility of evidence submitted by Windsor to establish that "rogue employees" had contaminated Westland's ground beef. In a videotape recording, two Westland employees were shown pushing downer cows with a forklift, shocking them with an electric prod, and spraying them with water to get them on their feet. The men were charged with felony animal cruelty.

As fact No. 52, Lloyds asserted that Windsor had been advised by an industry expert that its claim would not be covered under the insurance policy. Lloyds cited email communications exchanged between Cramer, Martinez, Stanley Smith, and an insurance

6

consultant, Robert Garfield. Windsor objected on the grounds of hearsay, relevance, and foundation and argued that Garfield's opinion "involved the general sentiments of the insurance industry about the legions of claims that affected companies were making." Finally, Lloyd responded to Windsor's various arguments—labeled as facts—about denial of coverage under the insurance policy as irrelevant, inaccurate, or not disputed.

### 3. The Summary Judgment Motion

In its order granting summary judgment to Lloyds, the trial court sustained Windsor's objections to the evidence Lloyds had submitted about the emails in support of fact No. 52. Nevertheless, the trial court found there were no triable issues of any material fact. The court cited the uncontroverted medical evidence by Dr. Johnson that there was no public health risk of CJD or BSE and the court found there was no evidence to establish tampering with an insured product. Additionally, the court found the recalled products were not an "Insured Product" under section 5.7 of the policy and Lloyds had acted reasonably in denying coverage.

III

DISCUSSION

### 1. Standard of Review

Summary judgment was properly granted in this case if there were no triable issues of material fact and Lloyds was entitled to judgment as a matter of law: "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations,

7

trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843; Code Civ. Proc., § 437c, subd. (c).)

Lloyds was entitled to summary judgment if it established a complete defense to Windsor's causes of action, or showed that one or more elements of each cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (o); *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 849.) Once Lloyd met its initial burden of production, the burden shifted to Windsor to demonstrate a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at pp. 850-851.)

The trial court bases its determination on the issues as framed by the pleadings and on the evidence submitted by the parties: "In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted, as well as those admitted and uncontested in the pleadings. [Citations.] The court must consider all evidence set forth in the parties' papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action, thereby entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1261.)

On appeal, we conduct a de novo review of the record: "We examine the evidence and independently determine its effect. [Citation.] We must uphold the judgment if it is correct on any ground, regardless of the reasons the trial court gave. [Citation.]" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn., supra*, 92 Cal.App.4th at p. 1261.)

8

The same principles apply in the insurance context if the evidence established as a matter of law that Lloyds's Contamination Products Insurance policy does not provide coverage to Windsor: "We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.] [¶] In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts." (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

*2. Interpretation of Insurance Contract*

Having independently reviewed the parties' combined separate statements, we conclude there is no evidence of material facts in dispute. The uncontradicted evidence establishes that Westland's ground beef was the subject of a voluntary Class II USDA recall because of potential risk from the use of downer cattle not because of contamination or tampering. In any event, there was no contamination or tampering. Windsor participated in the recall but no one suffered any illness or injury. Lloyds rejected Windsor's claim for recall damages because the Contamination Products Insurance policy did not provide recall coverage.

In view of the undisputed facts, our task is apply the three-step process for interpretation of an insurance contract to decide whether there is coverage. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.) The ordinary rules of contractual interpretation, which apply to Lloyds's insurance policy, include the fundamental goal of

9

giving effect to the mutual intention of the parties. When clear and explicit contractual language governs, intent is to be inferred solely from the written provisions of the contract if possible. (*Powerine Oil Co., Inc. v. Superior Court, supra,* 37 Cal.4th at p. 390, citing *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 and *AIU Ins. Co.,* at pp. 821-822.) As an insurer, Lloyds is entitled to limit its coverage to defined risks and, if it does so in clear language, courts will not impose coverage where none was intended. (*National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386.) Whether a clause is ambiguous and whether Windsor has an objectively reasonable expectation of coverage in light of the insuring language are questions of law. (*Schrillo Co. v. Hartford Accident & Indemnity Co.* (1986) 181 Cal.App.3d 766, 775-776.)

Under the first-party policy in this case, after Lloyds explained its reason for denying coverage, Windsor had the burden "'"to prove that an event is a claim within the scope of the basic coverage."'" (*Central Nat. Ins. Co. v. Superior Court* (1992) 2 Cal.App.4th 926, 932-933.) Specifically, Windsor must prove its claim falls within coverage for the "named peril" of section 5.10, Malicious Product Tampering, which means "the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insured['s] Products . . . so as to give the Insured's consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use." Windsor must also prove that the tampering affected an "Insured Product," defined by section 5.7 as "all products including their ingredients and components *once*

10

*incorporated therein of the Insured* that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . . [Emphasis added.]"[3]

The parties, of course, disagree about how to interpret Lloyds's policy. Beginning with the meaning of "Insured Product," Windsor contends that losses caused by the recall qualify for coverage because, ultimately, Westland's ground beef was an ingredient incorporated into Windsor's final product. Lloyds counters that an ingredient is only covered once it has been incorporated into Windsor's products. To use frozen burritos as an example, Windsor would propose that a frozen burrito made with adulterated ground beef is an insured product. Lloyd would counter that a frozen burrito is only an insured product if it is adulterated during or after its preparation by Windsor. Lloyds disagrees that "Insured Product" includes ingredients used to make Windsor's products.

A policy provision is considered ambiguous when it is capable of two or more reasonable constructions. (*Powerine Oil Co., Inc. v. Superior Court, supra,* 37 Cal.4th at p. 390, citing *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 and *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867; see *Fresh Express, Inc. v, Beazley Syndicate 2623/623 at Lloyd's* (2011) 199 Cal.App.4th 1038, 1052-1053.) However, "[c]ourts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Ins. Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807; *City of Laguna Beach v. Mead Reinsurance Corp.* (1990) 226 Cal.App.3d 822, 830.)

---

[3] In its reply brief, Windsor incorrectly asserts that the definition of an insured product does not apply to malicious product tampering.

11

We conclude the subject policy is not ambiguous. Unlike the dissent, we hold the policy's definition of what constitutes an insured product clearly does not encompass an ingredient obtained from a supplier, like the ground beef supplied by Westland. Lloyds's policy provides coverage for insured products and an insured event. An insured event involves product contamination or tampering. An "Insured Product" means "all products including their ingredients and components *once incorporated therein of the Insured* that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . . [Emphasis added.]" In plainer language, Windsor must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process. In order for a frozen burrito to qualify as an insured product, there must have been contamination or tampering during production, manufacture, packaging, or distribution—not because one of its ingredients supplied by a third party was adulterated. (See *Caudill Seed & Warehouse Co., Inc. v. Houston Cas. Co.* (2011) 835 F.Supp.2d 329, 335-336 [ recall of peanut products processed by insured did not trigger accidental product contamination coverage.].)

Furthermore, there is also no evidence of any contamination or tampering of Westland beef. It is not disputed that Westland employees apparently mistreated animals at the slaughterhouse. However, the record establishes that the reason for the recall was Westland's failure to notify the USDA about "downer cattle" and submit to an inspection, not because there had been tampering or contamination. It is therefore undisputed there is no evidence that the recall occurred because Westland employees tampered with or contaminated the ground beef supplied to Windsor.

12

When adulterated ingredients are supplied by a third party, as may have occurred here, the policy does afford coverage for accidental product contamination under section 5.1. The coverage only applies, however, if some injury occurs within 120 days of consumption of the product. In this case, no injury occurred within 120 days or at all. Therefore, according to the plain language of the policy, no insured event was covered under the policy. (See *Fresh Express, Inc. v, Beazley Syndicate 2623/623 at Lloyd's, supra,* 199 Cal.App.4th at pp. -1054.)

In the absence of any ambiguity in the insurance policy, we find it unnecessary to seek additional legal definitions or to consult the dictionary for the meaning of commonly-understood terms like tampering, adulteration, alteration, or malicious. We also reject Windsor's unsupported argument that any losses caused from tampering by a third party, which is discovered during the policy period, should be covered. Windsor cites no pertinent authority for this position.

Windsor offered no evidence proving it was entitled to coverage under the policy for accidental contamination or malicious tampering involving an insured product. Consequently, there was no breach of contract or implied covenant and no bad faith. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 36; *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1078; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345-347.)

Our conclusions in this case are supported by various federal authorities. In *The Limited, Inc. v. Cigna Ins. Co.* (E.D. Pa. 2001) 228 F. Supp. 2d 574, 580, the district court concluded that a Product Tampering & Accidental Contamination Insurance Policy

13

indicated that "the parties intended to have coverage for only those specific instances of product tampering and accidental contamination, not for product recalls in general . . . ." In *Ruiz Food Products, Inc. v. Catlin Underwriting U.S., Inc.*, No. 1:11-CV-00889-BAM, 2012 WL 4050001, at page 6 (E.D. Cal.2012), the district court agreed: "Recalls generally, even if related to a belief that a product has been contaminated, does not qualify as a contamination under an accidental contamination policy." In *Hot Stuff Foods, supra,*771 F.3d at pages 1075-1076, the Eight Circuit recognized that contamination products insurance and recall insurance afford different kinds of coverage: "At least some general commercial liability policies exclude losses incurred because of a recall. [Citation.] The need to recall contaminated or adulterated product is a recognized risk of doing business in the heavily regulated food industry. Thus, the exclusion compels food companies such as Hot Stuff to purchase policies separately insuring against this risk. . . . [¶] . . . [¶] This . . . brings into focus why insurers and food industry insureds would agree to limit Accidental Product Contamination coverage to recall incidents in which consumption of the contaminated or mislabeled product 'resulted, or may likely result' in physical symptoms of bodily injury, sickness or disease or death of any person. As other courts to consider this coverage have concluded, this 'is not a recall insurance policy.' *Ruiz*, 2012 WL 4050001, at *10; see *The Limited*, 228 F.Supp.2d at 580."

14

## IV

## DISPOSITION

The contamination products insurance policy issued by Lloyds did not cover Windsor's losses caused by the voluntary recall of Westland's ground beef.  We affirm the summary judgment.  Lloyds, the prevailing party, shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>

J.

I concur:


<u>McKINSTER</u>

Acting P. J.

15

King, J., Dissenting.

As the moving party, the defendant has the burden of demonstrating there is no potential for coverage under the terms of its policy. (See *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [defendant and moving party/nonparticipating insurer failed to meet its burden of showing that no potential for indemnity existed under terms of its policy on motion for summary adjudication]; see also *Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1124 [plaintiff and moving party insurer failed to meet its burden of showing there was no potential for coverage under the terms of its policy on motion for summary judgment]; Code Civ. Proc., § 437c, subd. (p)(2).)[1]

We independently review a trial court's interpretation of the terms of an insurance contract, pursuant to well-settled rules of contract interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 (*E.M.M.I.*).)

"'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties.

---

[1] At trial, the plaintiff insured has the burden of demonstrating the potential for coverage under the terms of the policy. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188.) Relying on *Central Nat. Ins. Co. v. Superior Court* (1992) 2 Cal.App.4th 926, 932-933, both defendant and respondent, the Underwriters of Lloyds of London, and the majority state that on a motion for summary judgment the burden rests with the nonmoving plaintiff (insured) to prove that """"an event is a claim within the scope of the basic coverage."""" I disagree; this statement runs counter to basic summary judgment law. Within the context of a summary judgment motion wherein the insurer is moving for summary judgment on the basis that there is no coverage, I believe the burden rests with the moving party (insurer) to demonstrate that there is no potential for coverage. (*Powerine Oil Co., Inc. v. Superior Court, supra,* 37 Cal.4th at p. 390.)

1

"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]"' [Citation.]" (*E.M.M.I., supra,* 32 Cal.4th at p. 470.) "Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) "If possible, the court should give effect to every provision. [Citations.] An interpretation which renders part of the [contract] to be surplusage should be avoided. [Citations.]" (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279.)

"A policy provision is ambiguous when it is susceptible to two or more reasonable constructions. [Citation.] Language in an insurance policy is 'interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' [Citation.] 'The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances of *this* case. [Citation.]'" (*E.M.M.I., supra,* 32 Cal.4th at p. 470.) "In determining whether an ambiguity exists, a court should consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. [Citation.]" (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246.)

2

"Ambiguity ""'is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.]' 'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured."'" [Citation.] "Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations."' [Citation.]" (*E.M.M.I., supra,* 32 Cal.4th at pp. 470-471.)

The policy provisions at the heart of the dispute are 5.7 and 5.10.

"5.7 '**Insured Products**' shall mean all products including their ingredients and components once incorporated therein of the **Insured** that are in production or have been manufactured, packaged or distributed by or to the order of the **Insured** including any new products which QBE has accepted in writing as a new product under Clause 4.5."

"5.10 '**Malicious Product Tampering**' shall mean the actual or threatened intentional, malicious and illegal alteration or adulteration of the **Insureds Products** whether in conjunction with a **Product Extortion Demand** or not so as to give the **Insured** or consumers reasonable cause to consider the **Insured Product**s unfit or dangerous for their intended use."

The majority believes these provisions are clear and that no ambiguity exists. As stated by the majority: "Lloyds's policy provides coverage for insured products and an

3

insured event. An insured event involves product contamination or tampering. An 'Insured Product' means 'all products including their ingredients and components *once incorporated therein of the Insured* that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . .' In plainer language, [plaintiff and appellant Windsor Food Quality Company, Ltd.] must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process." (Maj. opn. *ante*, at pp. 11-12.) I believe this is incorrect.

I do not believe the majority is properly construing the policy. In my mind, the policy does not clearly and explicitly state what the majority says it does. Within the context of the present matter, the more reasonable reading of the policy is that the product, and all of its ingredients, are insured for adulteration regardless of when the adulteration occurs. Thus to the extent there are two reasonable interpretations, the policy is ambiguous and should be construed against the insurer;[2] the summary judgment should be denied.

Looking first to clause 5.7, it provides: "'**Insured Products**' shall mean all products including their ingredients and components once incorporated therein of the **Insured** that are in production or have been manufactured, packaged or distributed by or to the order of the **Insured** including any new products which QBE has accepted in writing as a new product under Clause 4.5."

---

[2] It is speculative to assess what the insurer believed the insured understood as to the scope of the coverage in that the present record does not contain any extrinsic evidence relevant thereto.

4

In interpreting this clause, the majority has focused on the words "once incorporated therein," and concluded that this provision can be interpreted in only one way—"Windsor must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process." (Maj. opn. *ante*, at pp. 11-12.) This interpretation is internally inconsistent.

By stressing the words "once incorporated therein," the majority is interpreting the above clause as indicating that adulteration of the ingredient must occur after the ingredient has become part of the product (i.e., the meat ingredient must be adulterated "once incorporated into" the burrito). I would suggest that if we accept this interpretation of when the ingredient must be adulterated, a large part of the production process would not be covered. While I am not familiar with the production of frozen burritos, I would think that the various ingredients of the burrito are at some point in time separate from each other or have been blended together without yet being placed into the tortilla. By adopting the majority's emphasis on "once incorporated therein," the meat or any other ingredient could be tampered with during the production process but before being "incorporated" into the burrito; as such, the adulteration would not be a covered loss. (The adulteration of the meat occurring before it was "incorporated therein.") As a result, the "once incorporated therein" language as interpreted by the majority is in conflict with the other portion of the majority's conclusion—that the tampering is covered if it occurs "*during* . . . manufacture." (Maj. opn. *ante*, at p. 12.)

5

If the ingredients have to be "incorporated therein" before the adulteration is covered, by definition adulteration that occurs "during" the production process is not covered because the ingredient has yet to be incorporated therein. The majority's dual interpretations are mutually exclusive and not a reasonable reading of the provisions.[3]

Further, if we are to accept the general premise of the majority that coverage exists only for adulteration "during or after the manufacture," one would have to conclude that the majority is not only reading out of clause 5.7, "including their ingredients and components once incorporated therein" (because as previously explained adulteration can occur during the manufacturing process yet before the ingredient has been incorporated therein), but also reading into clause 5.10, "occurring during production, manufacturing, packaging or distribution." To reach the majority's interpretation of the words "once incorporated therein" and that the adulteration must occur during or after the manufacturing process, the two clauses by necessity would have to read as follows:

"5.7 '**Insured Products**' shall mean all products ~~including their ingredients and components once incorporated therein~~ of the **Insured** that are in production or have been manufactured, packaged or distributed by or to the order of the **Insured** including any new products which QBE has accepted in writing as a new product under Clause 4.5."

"5.10 '**Malicious Product Tampering**' shall mean the actual or threatened intentional, malicious and illegal alteration or adulteration of the **Insureds Products**

---

[3] In looking at the mutual intention of the parties, I do not think the parties intended not to have covered adulteration during production.

6

[*during production, manufacturing, packaging or distribution*] whether in conjunction with a **Product Extortion Demand** or not so as to give the **Insured** or consumers reasonable cause to consider the **Insured Product**s unfit or dangerous for their intended use."

It is only after these modifications are made, can the policy be plainly interpreted as the majority wishes.

Lastly, even language that may be plain and clear, as suggested by the majority, may be found as ambiguous when read in the context of the policy and the circumstances of the case. Here, the insured is Windsor Quality Food Company, Ltd., along with various named subsidiaries and divisions. As set forth in defendant's undisputed statement of facts, No. 2, "[p]laintiff is a leading manufacturer and marketer of frozen ethnic foods, appetizers and other products [*sic*] food products purchased by consumers." Within the context of the policy and the circumstances of the case, each party to the insuring agreement should well recognize that the insured produces and manufactures frozen foods. Perhaps with some exceptions, frozen ethnic foods and appetizers are nothing more than the compilation of various ingredients resulting in the product. In the case of a burrito, these ingredients end up resulting in a product where the individual ingredients are, in essence, inseparable; that is, it would be impossible to tamper with an ingredient after its incorporation into the product without tampering with the product as a whole. Thus, to conclude as does the majority, that the tampering with an ingredient

7

must occur after the ingredient is "incorporated therein," makes no sense. If such was the case, the policy need only provide for tampering with the "product."

Simply stated, the phrase "once incorporated therein" found in clause 5.7, does not modify when the tampering must occur, but rather when the adulterated ingredient becomes covered. Clause 5.10 thereafter provides that the "Insured Product" must be "maliciously and illegal[ly] alter[ed] or adulterat[ed]." Clause 5.10 does not provide a time constraint as to when the alteration or adulteration must occur. The adulteration of the ingredient can occur before it is incorporated into the product, but only becomes covered once it is incorporated into the product.

Taken together and reasonably read as a whole, the policy covers the present adulteration.

The majority relies a number of cases which I believe are not applicable. It first references *Caudill Seed & Warehouse Co. v. Houston Cas. Co.* (W.D. Ky. 2011) 835 F.Supp.2d 329, 335-336, for the proposition that "[i]n order for a frozen burrito to qualify as an insured product, there must have been contamination or tampering during production, manufacture, packaging, or distribution—not because one of its ingredients supplied by a third party was adulterated." (Maj. opn. *ante*, at p. 12.) In *Caudill*, the plaintiff produced peanut products. Just as the meat here was tampered with prior to arriving at plaintiff's plant, the peanuts in *Caudill* were contaminated before arriving at the plaintiff's plant. The relevant policy provision in *Caudill* provided: "ACCIDENTAL PRODUCT CONTAMINATION [is]: [¶] (1) any accidental or unintentional

8

contamination, . . . *during* the manufacture, blending, mixing, compounding, . . . of the Named Insured's Products . . . ." (*Id.* at p. 333, italics added.) In finding no coverage, the court indicated: "After reviewing the language of the Policy, the Court finds that the Peanut Claim is not covered. The Court agrees that the impairment of the peanuts did not occur '*during* the manufacture, blending, mixing, compounding, packaging, . . . of the Named Insured's PRODUCTS[.]'" (*Id.* at pp. 335-336.) Our case is unlike *Caudill*. There, coverage was limited to contamination "during" the manufacturing process. Here, the word "during" is not used in any of the insuring clauses. Thus, I do not believe *Caudill* stands for the proposition cited by the majority.

Next, the majority relies on *The Limited, Inc. v. Cigna Ins. Co.* (E.D. Pa. 2001) 228 F.Supp.2d 574, 580, for the point that the Product Tampering & Accidental Contamination Insurance Policy covers only instances of accidental contamination and product tampering and does not provide for product recalls in general. (Maj. opn. *ante*, at p. 13.) I note initially that regardless of whether the present policy is a "recall policy," clause 1.3, subdivision (b) covers "[t]he reasonable and necessary costs and expenses of recall or withdrawal of **Insured Products** . . . ." Further, in *The Limited, Inc.*, there was no contamination or product tampering. The issue was a defective canister into which the product had been placed; there was no evidence that the product or the canister had been contaminated or adulterated. There was merely a defective cap on the canister, a risk not covered by the policy. (*Id.* at p. 580.)

9

The majority relies on *Ruiz Food Products, Inc. v. Catlin Underwriting U.S., Inc.* (E.D. Cal. Sept. 13, 2012, No. 1:11-CV-00889-BAM) 2012 WL 4050001, at page *6 for the notion that: "Recalls generally, even if related to a belief that a product has been contaminated, does not qualify as a contamination under an accidental contamination policy." (Maj. opn. *ante*, at p. 13.) *Ruiz's* discussion and holding are inapplicable to the present facts. There, the issue was whether an ingredient in a beef spice mix which was produced by a downstream supplier, was contaminated. While some of the beef spice mix supplied to other manufacturers was contaminated, the beef spice mix supplied to Ruiz tested as being not contaminated. As indicated by the court, "[o]nly one lot of Basic's HVP tested positive for Salmonella, and that particular lot was not sent to Superior, and thus, did not reach Ruiz." (*Id.* at p. *2.) In addressing the insurance policy, the court indicated that "accidental contamination" is "'any accidental or unintentional contamination . . . provided that the use or consumption of Insured product(s): [¶] . . . Has resulted in or would result in clearly identifiable internal or external physical symptoms of bodily injury . . . ." (*Id.* at pp. *2-*3.) The court concluded by holding that because Ruiz's product was not actually contaminated it would not result in bodily injury and therefore was not covered. In the present case, the policy does not require that the adulteration "*result* in clearly identifiable internal . . . physical symptoms of bodily injury." (*Id.* at p. *14.)

In sum, I do not believe the relevant policy provisions have the clear and explicit meaning that is placed upon them by the majority. When viewing the circumstances of

10

the case, and clauses 5.7 and 5.10 when read together, the policy provides coverage for adulteration of those individual ingredients incorporated into the product, with no time constraints as to when the ingredient must be adulterated.

As to defendant's further arguments, I believe triable issues of fact exist as to whether the adulteration was malicious and illegal, as well as whether the adulteration was such as would "give the **Insured** or consumers reasonable cause to consider the **Insured Products** unfit or dangerous for their intended use." There is evidence in the record that there was a Class II recall, which means "a health hazard situation where there is a remote probability of adverse health consequences." The Food Safety and Inspection Service designated the beef as unfit for human consumption and plaintiff was requested by the United States Department of Agriculture to comply with the requirements for the product recall. Further, there was no evidence submitted by defendant that the adulteration of the meat was not illegal and was not done with conscious disregard for the health and safety of others.

All told, I believe triable issues of material fact remain as to whether coverage exists for plaintiff's losses.

KING

J.

11

Filed 3/3/15

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| WINDSOR FOOD QUALITY COMPANY, LTD., | E058324 |
| Plaintiff and Appellant, | (Super.Ct.No. CIVRS905013) |
| v. | ORDER |
| THE UNDERWRITERS OF LLOYDS OF LONDON et al. | |
| Defendants and Respondents. | |

IT IS ORDERED that the February 19, 2015, request for publication of the opinion filed February 6, 2015, is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c).

CODRINGTON
J.

McKINSTER
Acting P. J.

KING
J.

See attached list

1

MAILING LIST FOR CASE: E058324
Windsor Food Quality Company, LTD. v. The Underwriters of Lloyds of London et al.

Superior Court Clerk
San Bernardino County
247 West Third Street
San Bernardino, CA 92415

Michael J. Bidart
Shernoff Bidart Echeverria Bentley LLP
600 South Indian Hill Blvd.
Claremont, CA 91711

Jeffrey I. Ehrlich
The Ehrlich Law Firm
16130 Ventura Boulevard, Suite 610
Encino, CA 91436

A. Raymond Hamrick
Hamrick & Evans, LLP
111 Universal Hollywood Drive
Suite 2200
Universal City, CA 91608